OPINION
{¶ 1} Appellant, Deanna Robertshaw-Surgenavic, appeals the judgment entry of the Mahoning County Court of Common Pleas, Domestic Relations Division, terminating the shared parenting plan previously entered into by her and her former husband, Appellee, Ethan Surgenavic, designating him as the residential parent for their daughter, Mia Keely Robertshaw-Surgenavic.
 {¶ 2} The parties' marriage was terminated by an agreed judgment entry of divorce filed on March 24, 2006. The entry designated Appellee as the residential parent of the parties' three older children, whose ages at the time ranged between two and seven, and incorporated a shared parenting plan for Mia, who was approximately one month old when the entry was issued, and will be three years old by the time this Opinion is issued.
 {¶ 3} On August 10, 2007, Appellee filed an omnibus motion requesting termination of the shared parenting plan, appointment of a guardian ad litem, a change in the visitation schedule for all of the children, and a recalculation of child support. In addition, Appellee requested that the trial court issue an order directing Appellant to undergo a psychological examination, and issue a contempt citation against her based upon her repeated refusals to comply with the court-ordered shared parenting schedule.
 {¶ 4} Following an evidentiary hearing, the trial court concluded that a change had occurred in Mia's circumstances, based upon her advance in age, and in the parties' circumstances, based upon their inability to cooperate on medical issues concerning Mia, and the comments made by the parties' eldest daughter, Cheyenne, *Page 2 
during her interview with the trial court. (1/28/08 J.E., p. 18.) The trial court found that the harm likely to be caused to Mia by a change of environment was outweighed by the advantages of the change of environment. After reviewing the factors enumerated in R.C. 3109.04(F)(1)(a)-(j), the trial court concluded that Mia's best interests would be served by designating Appellee as Mia's residential parent, and granting Appellant the same parenting schedule rights with Mia that she enjoys with the other children. (1/28/08 J.E., p. 22.)
 {¶ 5} The trial court granted all of the motions, with the exception of Appellee's requests for the psychiatric exam and the contempt citation, which the trial court determined were moot since it had, "granted [Appellee] the ultimate relief the Court believes he was seeking." (1/28/08 J.E., p. 25.) The termination of the shared parenting plan and the designation of Appellee as the residential parent are the sole issues on appeal.
 {¶ 6} Appellant contends that the trial court abused its discretion in designating Appellee as Mia's residential parent because there was insufficient evidence of changed circumstances on the part of Mia or the parties. Based upon the trial testimony, Appellant has failed to establish that the court's decision was unreasonable, arbitrary, or unconscionable, and, accordingly, the decision of the trial court is affirmed. For the purposes of appeal, we shall construe Appellant's "Issues Presented" as an assignment of error.
 ISSUES PRESENTED: *Page 3 {¶ 7} "WHETHER THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN TERMINATING THE SHARED PARENTING PLAN PREVIOUSLY ENTERED INTO BY THE PARTIES AND DESIGNATING APPELLEE RESIDENTIAL PARENT."
 {¶ 8} R.C. 3109.04(E) includes four separate provisions authorizing the modification or termination of a shared parenting plan. First, R.C. 3109.04(E)(1)(a) requires that a trial court find a change of circumstances of the child, residential parent, or either parent subject to a shared parenting plan before modifying parental rights and responsibilities. R.C. 3109.04(E)(2)(a) authorizes parents to jointly modify the terms of a shared parenting plan. R.C. 3109.04(E)(2)(b) authorizes the trial court to act on its own motion to modify a shared parenting plan, and R.C. 3109.04(E)(2)(c) authorizes the court to terminate a shared parenting plan.
 {¶ 9} Although Appellee requested "termination" of the shared parenting plan, R.C. 3109.04(E)(2)(c) is not applicable in this case. The Ohio Supreme Court, in Fisher v. Hasenjager, 116 Ohio St.3d 53,2007-Ohio-5589, 876 N.E.2d 546, recently recognized that a shared parenting plan is not the vehicle by which a trial court designates a residential parent or legal custodian. Id., ¶ 31. Because the designation of the residential parent and legal custodian involves the allocation of parental rights and responsibilities, "R.C. 3109.04(E)(1)(a) controls when a court modifies an order designating the residential parent and legal custodian." Id., ¶ 26.
 {¶ 10} R.C. 3109.04(E)(1)(a) reads, in pertinent part: *Page 4 
 {¶ 11} "The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies:
 {¶ 12} "* * *
 {¶ 13} "(iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child."
 {¶ 14} The intent of the statute is to spare children from the constant tug-of-war that might ensue between parents who may file a motion for change of custody each time the parent without custody thought he or she could provide the children a better environment.Wyss v. Wyss (1982), 3 Ohio App.3d 412, 416, 445 N.E.2d 1153. If a trial court determines that a change of circumstances has occurred, it must then consider the statutory factors governing the "best interest of the child" test, pursuant to R.C. 3109.04(F)(1), which provides:
 {¶ 15} "In determining the best interest of a child pursuant to this section, whether on an original decree allocating parental rights and responsibilities for the care of children or a modification of a decree allocating those rights and *Page 5 
responsibilities, the court shall consider all relevant factors, including, but not limited to:
 {¶ 16} "(a) The wishes of the child's parents regarding the child's care;
 {¶ 17} "(b) * * * [T]he wishes and concerns of the child * * *;
 {¶ 18} "(c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
 {¶ 19} "(d) The child's adjustment to the child's home, school, and community;
 {¶ 20} "(e) The mental and physical health of all persons involved in the situation;
 {¶ 21} "(f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;
 {¶ 22} "(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;
 {¶ 23} "(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense * * * and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;
 {¶ 24} "(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court; *Page 6 
 {¶ 25} "(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state."
 {¶ 26} The Fisher Court acknowledged that the burden to show a "change" is a high one. Id., ¶ 33; see also Davis v. Flickinger (1997),77 Ohio St.3d 415, 418, 674 N.E.2d 1159 ("there must be a change of circumstances to warrant a change of custody, and the change must be achange of substance, not a slight or inconsequential change.") (Emphasis in original.) However, the Davis Court also stated that, "[i]n determining whether a change in circumstances has occurred so as to warrant a change in custody, a trial judge, as the trier of fact, must be given wide latitude to consider all issues which support such a change, including a change in circumstances because of the child's age and consequent needs, as well as increased hostility by one parent (and that parent's spouse) which frustrates cooperation between the parties on visitation issues." Id. at 416-417, 674 N.E.2d at 1161.
 {¶ 27} An appellate court may not disturb the decision of the trial court in a custody matter unless the trial court has committed an abuse of discretion. Pater v. Pater (1992), 63 Ohio St.3d 393, 396,588 N.E.2d 794. The Supreme Court has interpreted the term "abuse of discretion" to mean that the trial court's attitude is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219,450 N.E.2d 1140. In applying the abuse of discretion standard, a reviewing court may not substitute its judgment for that of the trial court. Pons v. Ohio State Medical Board (1993), 66 Ohio St.3d 619, 621,614 N.E.2d 748. *Page 7 
 {¶ 28} After review of the trial transcript, it is clear that a substantial change has occurred based upon Mia's advance in age from infancy and the growing animosity between the parties. The trial court relied upon specific language in the shared parenting plan to establish that the parties intended that Mia would follow the same parenting time schedule as the other children, as soon as she was physically able. The trial court quoted the shared parenting plan to demonstrate that Appellant was designated the primary residential parent based solely upon Mia's "tender age," but that, "[t]he intent of the parties is that as [Mia] grows older, she will spend more and more time with [Appellee] until she follows the same parenting time schedule as the parties' other children specified in the Agreed Judgment Entry Decree of Divorce, Section IV Parental Rights and Responsibilities." (Emphasis omitted.) (1/28/08 J.E., p. 19.) Handwritten amendments to the shared parenting plan indicate that Mia was breast feeding when the plan was executed. (3/26/06 Shared Parenting Plan, p. 1.) There was trial testimony to establish that Mia was no longer even bottle-fed, and that she wears diapers only at bedtime when she stays with Appellee. (Trial Tr., pp. 82-83.) This testimony is consistent with the parties' plan that when Mia was no longer physically dependent upon Appellant, Appellee would become her residential parent.
 {¶ 29} In addition to recognizing that the parties had anticipated that Appellee would eventually become Mia's residential parent, the trial court also relied on a change in the parties' circumstances, that is, their rancorous disagreements *Page 8 
regarding Appellee's visitation rights and medical treatment for the children, to conclude that Appellee should be designated the residential parent for Mia.
 {¶ 30} Appellee testified that his relationship with Appellant has degenerated since the divorce. (Trial Tr., p. 91.) He stated that she is unable to discuss anything in a civil manner. He testified that he has witnessed her raising her voice at the children and "be[ing] physical" with them, and that Mia cries when she is forced to leave his home and the other children do not have to go. (Trial Tr., p. 83.) He accused Appellant of instructing his oldest son to prepare a peanut butter sandwich for a stepbrother who is allergic to peanuts. (Trial Tr., p. 80.) He testified that Appellant is belligerent toward him in front of the children, and often refuses to give Mia to him when he picks up the children. (Trial Tr., pp. 81, 83.) He claimed that Appellant has refused to comply with the visitation schedule on 50-60 occasions. (Trial Tr., p. 63.)
 {¶ 31} Appellant's testimony confirmed the increasing hostility in the parties' relationship. She testified that Appellee, "tells [her] all the time horrible things, get a job, he's screaming at [her]." (Trial Tr., p. 136.) Appellant conceded that she once told Appellee that he would never see Mia, however, Appellant felt justified in making that statement because he only took an interest in Mia's care after he remarried. (Trial Tr., p. 136.)
 {¶ 32} The trial court noted that, at the September 19, 2007 hearing, Appellant testified that Mia is a "child born of rape," and that, although the prosecutor's office did not file charges, she was pursuing a case against Appellee with the "Justice *Page 9 
League of Ohio." (1/28/08 J.E., p. 3.) The trial court further noted that Appellant testified that her own medical problems forced her to abandon her claims against Appellee, see infra. at pp. 12-13.
 {¶ 33} Appellant also conceded that she has repeatedly refused to comply with the court-ordered visitation schedule because Mia is frequently ill. (Trial Tr., p. 137.) Appellant testified that Mia suffers from chronic kidney infections (pyelonephritis). (Trial Tr., 137.) However, on cross-examination, she stated that Mia has been "on watch" for kidney problems, which cannot be diagnosed until a certain age. (Trial Tr., p. 155.) She explained that Mia is "on watch," not because of chronic kidney infections, but, instead, because Appellant only has one kidney and "kidney problems run in [her] family." (Trial Tr., pp. 155-156.) She stated that Mia had suffered four seizures in the previous twelve months that were the result of a high fever. (Trial Tr., p. 138.) Appellant further stated that Mia has had measles three times and is particularly susceptible to colds. (Trial Tr., pp. 137, 193.)
 {¶ 34} Appellee testified that he has never received any bills from a kidney specialist. (Trial Tr., p. 68.) He further testified that when Mia visited, she often had diaper rash, and Appellant instructed Appellee and his wife not to treat the rash because it was a recurrence of the measles. (Trial Tr., p. 82.) Contrary to Appellant's instructions, Appellee would treat the rash with diaper cream and the rash would subside over the course of the weekend visitation.
 {¶ 35} When asked why Mia's pediatrician's records do not reflect that she has been treated for kidney problems or the measles, Appellant explained that she took *Page 10 
Mia to see her boyfriend's physician when she had the measles. (Trial Tr., p. 194.) Appellant further explained that Mia has been seen by a kidney specialist from Allegheny General Hospital at Tod Children's Hospital, and her pediatrician, "did not get the information because somebody gave her the wrong, the hospital, treating hospital, the wrong information from (inaudible)." (Trial Tr., pp. 139, 186.) She further stated that the pediatrician's record are incomplete because, "[i]t extends from [Mia's previous pediatrician] and also the person providing the medical information, when she first went to the hospital to the emergency room for it was [Mia's pediatrician] and his now current wife and the wrong information was provided to the hospital as well." (Trial Tr., p. 184.)
 {¶ 36} In addition to providing a number of incomprehensible answers to questions about Mia's medical care, Appellant was often at a loss to remember Mia's specialists' names. (Trial Tr., pp. 185, 186.) Appellant testified that she must keep a journal of the children's medical problems, because she is unable to remember the specific details without consulting her notes. (Trial Tr., p. 195.)
 {¶ 37} The diametrically-opposed opinions of the parties regarding their children's health are not limited to Mia. Appellant contends that her younger son, Keaton, may have a congenital heart defect, which requires a baseline cardiac evaluation. (Trial Tr., p. 196). She blamed Appellee for preventing her from completing the evaluation because she needed his consent, but she conceded that she has sought medical treatment for the children in the past without his consent. *Page 11 
(Trial Tr., pp. 196-197.) She further testified that Keaton has emotional problems that have caused him to erupt into violent tantrums. (Trial Tr., p. 174.)
 {¶ 38} She stated that she was approached by a "renowned psychologist," Dr. Gregory Yeck, at a store in Akron who told her to hold Keaton when he has a tantrum and rock him in her arms. (Trial Tr., pp. 164-165, 176-177.) Later in her testimony, she stated that she was not certain that the gentleman who approached her in the store was actually Dr. Yeck or just one of his colleagues. (Trial Tr., pp. 177-178.) She acknowledged that Keaton's preschool has never reported any behavior problems, but attributed it to a lack of consistent attendance at preschool. (Trial Tr., p. 174.)
 {¶ 39} Appellee, on the other hand, characterized Keaton as a "typical kid." (Trial Tr., p. 103.) He denied that Keaton had a heart problem, and testified that Keaton never bit, hit, or kicked anyone when he was at Appellee's residence, although he conceded that Keaton occasionally throws a temper tantrum. (Trial Tr., pp. 104-105.)
 {¶ 40} Appellant has also sought psychological treatment without Appellee's consent for her oldest son, Darius, who she claims had been doing, "a lot of things kind of sexual in nature," and that caused her extreme concern. (Trial Tr., p. 134.) Darius' school principal and one of his teachers testified at trial, but neither witness provided any testimony confirming that kind of behavior.
 {¶ 41} Based upon the parties' agreement that Appellee would become Mia's residential parent when she is no longer physically dependant upon Appellant, and *Page 12 
the "increased hostility" by Appellant that is clearly, "frustrat[ing] cooperation between the parties," as to both medical care and visitation issues, Davis, at 417, 674 N.E.2d at 1161, we find that the trial court did not abuse its discretion in terminating the shared parenting plan and designating Appellee as the residential parent for Mia.
 {¶ 42} Moreover, although it was a part of the trial court's R.C. 3109.04(F)(1)(a)-(j) analysis, Appellant's own litany of alleged medical problems also constitutes a substantial change in the circumstances of one of the parties. Appellant testified that she was diagnosed with Non-Hodgkins Lymphoma in 2001, but received a clean bill of health in 2003. (Trial Tr., p. 161.) Then, on cross-examination, she stated that the Lymphoma resurfaced on a brain scan in 2006 and that she is currently part of an experimental treatment program at the Cleveland Clinic, which involves, "hyper doses of vitamins and radioactive isotopes and something, IVs." (Trial Tr., pp. 179-180.) She testified that she completed the experimental treatment in August of 2007. (Trial Tr., p. 180.)
 {¶ 43} When asked whether she recalled shoving one of the children into a clothes basket, she testified that she could not remember much of anything that happened in the past ten years due to a brain injury she suffered as a result of a car accident on May 9, 2006. (Trial Tr., p. 170.) In addition, Appellant stated that she had a "series of several surgeries" in 2006, (Trial Tr., p. 128), including an outpatient valve reversal in her stomach, which prevented her from eating, (Trial Tr., pp. 187-188), and that she has a "liver deficiency." (Trial Tr., p. 210.) Appellant *Page 13 
acknowledged that she has gone through "an awful lot in the last three years." (Trial Tr., p. 182.)
 {¶ 44} Finally, when asked whether she raises her voice to the children, she testified that, since 2006, the barometric pressure affects her vocal chords, causing her tone to be uncontrollably harsh. (Trial Tr., p. 127.) Although she denied ever being treated for mental issues, (Trial Tr., p. 162), she admitted to seeing a mental health counselor "when [she] feel[s] like it." (Trial Tr., p. 211.)
 {¶ 45} Based upon the foregoing testimony provided by Appellant, the trial court concluded that she, "appears to have a significant number of emotional problems." The trial court also wrote that Appellant's testimony about her health and the health of the children was, "`all over the map' and lacking in consistency and credibility." (1/28/08 J.E., p. 21.)
 {¶ 46} When reviewing a trial court's decision in a custody matter, several Ohio courts have recognized that, "[t]he knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record."Beismann v. Beismann, 2nd Dist. No. 22323, 2008-Ohio-984, ¶ 20, citingMiller v. Miller (1988), 37 Ohio St.3d 71, 74, 523 N.E.2d 846. Here, the trial court obviously credited Appellee's testimony that Mia is old enough to fulfill the intentions of the parties expressed in the divorce decree. Likewise, the trial court also credited Appellee's testimony that the children are well and well-behaved in his home, and that Appellant's behavior toward him and the children has become increasingly volatile. Finally, the trial court was critical of *Page 14 
Appellant's admitted non-compliance with the court-ordered visitation schedule, and called into question her explanation, Mia's purported medical problems, for refusing Appellee's visitation rights.
 {¶ 47} Based upon the trial testimony, the domestic relations court did not abuse its discretion in terminating the shared parenting plan and designating Appellee as the residential parent. Accordingly, the judgment of the trial court is affirmed.
Donofrio, J., concurs.
DeGenaro, J., concurs. *Page 1